

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-11-00547-CR

Daniel **LOPEZ**, Jr.,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 229th Judicial District Court, Jim Hogg County, Texas
Trial Court No. 08-CRJ-07
Honorable Ana Lisa Garza, Judge Presiding

Opinion by:    Rebeca C. Martinez, Justice

Sitting:    Catherine Stone, Chief Justice
Sandee Bryan Marion, Justice
Rebeca C. Martinez, Justice

Delivered and Filed:  April 24, 2013

AFFIRMED

Daniel Lopez, Jr. appeals his conviction and sentence for theft of crude oil valued at more

than $100,000 but less than $200,000.  We affirm the trial court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Between December 1, 2007 and February 2, 2008, crude oil in the care and custody of

Taylor Propane Gas and Liquids, Inc. ("Taylor") was unlawfully appropriated from storage tanks

located at the Hebbronville transfer station in Jim Hogg County, Texas.   Taylor is an

independent transport company that picks up crude oil from various leases and delivers the oil to

transfer stations where the oil is stored until it is picked up for delivery to a refinery. Shell Trading Company U.S. ("Shell") contracted with Taylor to pick up and transport Shell's crude oil to the storage tanks. Taylor was responsible for the oil until it was "metered out" and picked up from the transfer station by another company for delivery to Shell's refineries. Norman Krutsinger, Operations Manager for Taylor, testified that, under the Shell contract, Taylor was required to compensate Shell for any shortages of oil that exceeded a loss allowance of 2/10 of 1% (0.002); the allowance is equivalent to two barrels out of every 1000 barrels transported.

Taylor leases tanker trucks to independent owner operators who use the trucks to transport crude oil exclusively for Taylor as its agents. In addition to driving their truck themselves, owner operators commonly hire an additional driver to maximize use of their truck because of federal restrictions on the number of hours that any one driver may operate the truck. The person operating the truck each day receives a dispatch sheet from a Taylor dispatcher instructing him which particular leases in his area need oil picked up and directing him to transport the oil and unload it at a particular transfer station in the area. When oil is picked up at a lease, the driver of the truck writes out a "run ticket" showing the total number of barrels being picked up based on his measurements. The driver leaves one copy of the run ticket at the lease, and turns in a copy to both Taylor and Shell. The drivers are also required to turn in a daily log documenting the loads they transported and the hours they worked. The tanker trucks hold approximately 200 barrels of oil, but generally transport between 185 and 195 barrels due to weight limits. The oil is unloaded into storage tanks at the transfer station by pumping it through a gauge meter that measures the volume of oil transferred.

At the end of 2007, Shell informed Taylor that it found significant oil shortages at the Hebbronville transfer station during the last few months of 2007. Shell sent an invoice to Taylor charging it $676,789 for total shortages from July 2007 through January 2008. Krutsinger

testified that Taylor ultimately paid Shell approximately $430,000 for the shortages as an "out of pocket" expense to Taylor.

Through its South Texas Team Leader, Howard Hoffa, Jr., and its field supervisor responsible for the Hebbronville facility, Oscar Lopez, Taylor began a systematic investigation to determine the cause of the shortages. Their investigation included checking the Hebbronville storage tanks for leaks, randomly gauging the tanker trucks and checking the drivers' measurements, calibrating the gauge meter at the Hebbronville facility, and sealing the water draw lines to eliminate the possibility of theft from the storage tanks. None of these steps revealed the cause of the shortages. Hoffa and Lopez then focused their investigation on the seven to ten owner operators and drivers of the transport trucks that usually delivered oil to the Hebbronville facility. Lopez isolated the tanks at the Hebbronville station, gauging the storage tanks before and after a driver unloaded his oil to determine the amount of oil actually unloaded, and then comparing that amount to the barrels reported on the driver's run ticket and the station's unloading log. The only truck that produced any discrepancies was truck # 84741 owned by Daniel Lopez, Jr.

In addition to driving the truck himself, in December 2007 Lopez hired an additional driver for the truck, Agapito Leija. Lopez always parked the truck overnight at his home in Weslaco, Texas. He drove Leija to his home in Donna, Texas, which was about ten to fifteen minutes away, on the days that Leija operated the truck. During the month of January 2008, Oscar Lopez of Taylor began doing a daily inventory on the Hebbronville storage tanks, producing a "daily over and short" on the tanks. The daily inventories, run tickets, and unloading logs were compiled into several reports, including a calendar (State Exhibit No. 183) showing whether Lopez or Leija was driving the truck each day from January 2 through February 2, 2008, and whether a shortage occurred at Hebbronville each day. The calendar

shows that significant shortages occurred on days when Lopez and Leija drove the truck. Oscar Lopez testified that a shortage was considered "significant" if it was over the loss allowance; a daily shortage of more than ten barrels was a significant loss for which Taylor had to compensate Shell. The calendar and supporting records show shortages over ten barrels on nine days in January on which Lopez himself drove the truck.

Taylor also had a GPS location system in a Qualcomm computer unit installed on all its trucks which transmitted the location of each truck by longitude and latitude every hour for purposes of prioritizing lease pick-ups. The Qualcomm records for Lopez's truck showed that it was at a location south of Donna, Texas (later determined to be a mechanic's garage belonging to Angel Rodriguez) at odd hours, either late at night or early in the morning, on several days between November 2007 to February 2, 2008 during which shortages occurred. A document (State Exhibit No. 184) showing the days and times at which Lopez's truck was located at the garage south of Donna was compiled by Taylor and admitted into evidence. Read together, State Exhibit Nos. 183 and 184 show that Lopez was the operator of the truck on three of the days it was located at the garage at an odd hour outside the normal workday.

On January 22, 2008, Oscar Lopez isolated and measured the Hebbronville tanks before and after Leija unloaded the tanker truck, and discovered that he had left about 80 barrels of oil in the truck. The Qualcomm system later showed the truck was located at the same mechanic's garage south of Donna at 10:22 p.m. that night before ultimately being driven to Daniel Lopez's residence. On the advice of the Railroad Commission, Krutsinger contacted the Texas Rangers to assist in Taylor's investigation. On February 2, 2008, the Hebbronville tanks were again isolated and measured before and after Leija delivered a load of 190 barrels of oil; the storage tank had a shortage of 95 barrels after Leija left. The truck was stopped south of Hebbronville by a D.P.S. License and Weight Officer who was working with Texas Ranger Robert Hunter.

The weight officer verified that there were still approximately 92 barrels of oil in the truck. While he was stopped, Leija called Daniel Lopez who, according to Leija, instructed him to tell the weight officer that he was taking the truck to the Delmita station in Starr County. When Leija left, Ranger Hunter followed him, without his knowledge, to a mechanic's garage on Victoria Road south of Donna which was owned by Angel Rodriguez. Hunter observed some oil tanks at the mechanic's shop. At the same time, Taylor's Qualcomm system showed the truck at the same location south of Donna where it had been tracked on several other occasions, as shown on State Exhibit No. 184. Daniel Lopez arrived and picked up Leija at the mechanic's garage. Both men were arrested after returning the truck to Lopez's residence in Weslaco. Leija immediately cooperated with the investigation, telling Ranger Hunter that he was only following Daniel Lopez's orders when he left oil in the truck.

A one-count indictment was returned against Daniel Lopez alleging that on or about December 1, 2007 through February 2, 2008, he "intentionally, knowingly and unlawfully appropriate[d], by acquiring and otherwise exercising control over, property, to wit: Crude Oil, of the value of more than $200,000.00, from Norman Krutsinger, in his capacity as Operations Manager for Taylor Propane Gas and Liquids, Inc., the owner thereof, without the effective consent of the owner, and with intent to deprive the owner of said property." *See* TEX. PENAL CODE ANN. § 31.03(a), (e)(7) (West Supp. 2012) (first degree felony theft). Leija was also indicted for the thefts.

At trial, Leija testified against Daniel Lopez in exchange for the State's agreement to drop the charge against him if he testified truthfully. Leija testified that he was following Lopez's instructions when, about twice a week, he did not unload the full amount of oil into the Hebbronville storage tanks and retained about 55 to 60 barrels of oil in the truck from the last load of the day; he would then meet Lopez and turn the truck over to him at the end of the

workday. Lopez received the dispatch sheets from Taylor and set the schedule for which days Leija would drive; he paid Leija a flat rate by the hour. Leija testified that he received all of his instructions from Lopez, turned in his run tickets to Lopez, and was required to notify Lopez of any problems with his pickups and unloading. Leija stated he followed Lopez's instructions about leaving oil in the tank when he unloaded at Hebbronville because he was afraid he would lose his job; Lopez was his boss and Leija did not ask questions. Leija denied lying on the Taylor forms, stating that Lopez was the one lying because he was the owner of the truck and Leija turned in his forms to Lopez at the end of each day. Leija testified that he did not know why Lopez wanted him to leave oil in the truck and did not know what happened to the oil; he stated that Lopez once told him he was taking the remaining oil to the port in Brownsville. Leija also testified that he never took any oil for himself and never got paid a percentage or other fee for taking the oil to another location. Leija also stated that Lopez sometimes directed him to drive the partially unloaded truck to a mechanic's shop on Victoria Road owned by Angel Rodriguez; one time he left the truck with unloaded oil there at night, and the tank was empty the next morning. Leija stated that, other than that one time, there would never be a reason for the truck to be at the mechanic's shop at 3:00 a.m. or 4:00 a.m. The truck was always parked at Lopez's house overnight, and never left overnight at Leija's house in Donna.

On the day they were arrested, Leija called Lopez after he was stopped by the weight officer and Lopez instructed Leija to say he was taking the truck to Delmita instead of to the mechanic's garage south of Donna. Leija stated that Lopez had instructed him to leave about 90 barrels in the tank and that Lopez knew there was still oil in the truck. According to Leija, Lopez seemed worried that Leija had been stopped. When he left the weight station, Leija did not drive the truck to the Delmita transfer station, but instead drove it to the mechanic's garage south of Donna per Lopez's instructions. Leija did not know he was being followed. Lopez was

at the garage when Leija arrived. Leija stated that Lopez seemed "paranoid and scared," and stated, "we got problems" when he noticed two vehicles pass by the garage. Leija stated he did not know what Lopez was talking about and just wanted to be left out of "the problem." When they were stopped and arrested by the Texas Ranger, Leija cooperated and gave a statement telling him what Lopez had instructed him to do with the oil.

In addition to Leija's testimony, Krutsinger, Hoffa, and Oscar Lopez testified about Taylor's investigation of the shortages at the Hebbronville station and about the various reports reflecting when Lopez and Leija each drove the truck, when the shortages occurred, and when GPS showed the truck at Angel Rodriguez's garage south of Donna. The reports and back-up documents were admitted into evidence. Ranger Hunter also testified to his role in the investigation. The jury convicted Daniel Lopez of appropriating $100,000 or more but less than $200,000 worth of crude oil, a lesser-included offense of the charged first degree theft offense. *See* TEX. PENAL CODE ANN. § 31.03(a), (e)(6) (West Supp. 2012) (second degree felony theft). Lopez received a ten-year sentence which was suspended and probated for ten years. The trial court imposed $100,000 in restitution payable to Taylor as a condition of his community supervision. Lopez now appeals.

## ANALYSIS

On appeal, Lopez argues the evidence is legally insufficient to support the jury's verdict of guilty, there was insufficient evidence to corroborate Leija's accomplice witness testimony, the court erred in failing to submit an accomplice witness instruction to the jury, the court erred in denying his motion for directed verdict, and the court erred in failing to timely enter judgment and in imposing an excessive amount of restitution. We will first address the issues concerning accomplice witness testimony in order to determine whether Leija's testimony may be considered within our legal sufficiency analysis.

### *Corroboration of Accomplice Witness Testimony*

Lopez argues that Leija was an accomplice witness, either as a matter of law or fact; therefore, Leija's testimony could not form the sole basis for his conviction unless corroborated by independent evidence linking Lopez to the theft of the oil. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005); *see also* TEX. PENAL CODE ANN. § 31.03(c)(2) (West Supp. 2012). Lopez asserts there is no such independent evidence. The State argues that Leija did not have the required culpable mental state to commit the thefts and, therefore, was not an accomplice.

Under the accomplice witness rule codified in article 38.14, a conviction cannot be upheld on the testimony of an accomplice witness unless the testimony is corroborated by other non-accomplice evidence that "tends to connect" the defendant to the offense committed. TEX. CODE CRIM. PROC. ANN. art. 38.14; *see also* TEX. PENAL CODE ANN. § 31.03(c)(2) (providing that, for purposes of showing an unlawful appropriation of property in a theft case, "the testimony of an accomplice shall be corroborated by proof that tends to connect the actor to the crime, but the actor's knowledge or intent may be established by the uncorroborated testimony of the accomplice"). Evidence that merely shows the offense was committed is not sufficient. TEX. CODE CRIM. PROC. ANN. art. 38.14; *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). An accomplice is a person who participated with the defendant before, during, or after the commission of the crime and acted with the required culpable mental state. *Smith*, 332 S.W.3d at 439; *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008). To be an accomplice, a person must have engaged in an affirmative act that promoted the commission of the offense, and not merely have known about the offense or failed to disclose it or helped conceal it. *Smith*, 332 S.W.3d at 439; *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). Depending on the evidence in a case, a prosecution witness may be an accomplice as a matter of law or as a matter of fact. *Smith*, 332 S.W.3d at 439. An accomplice as a matter of law is a person susceptible to

prosecution for the same offense with which the defendant is charged or a lesser-included offense. *Id.*; *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004). A witness who is indicted for the same offense, or a lesser-included offense, as the defendant is an accomplice as a matter of law, unless the State dismisses the charge before the witness testifies against the defendant. *Smith*, 332 S.W.3d at 439. If, however, the witness agrees to testify against the defendant in exchange for dismissal of the charge, then he continues to be considered an accomplice as a matter of law. *Id.* If there is conflicting evidence as to whether a witness is an accomplice, then the trial judge may instruct the jury to determine whether the witness is an accomplice as a matter of fact. *Id.* at 439–40.

In reviewing the sufficiency of the corroborating evidence in the record, we exclude the accomplice testimony from our consideration and focus on the remainder of the record to determine whether there is any independent evidence that tends to connect the defendant with the commission of the crime. *Id.* at 442; *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). We judge the sufficiency of the non-accomplice evidence according to the particular facts and circumstances of each case. *Smith*, 332 S.W.3d at 442. The corroborating evidence may be direct or circumstantial, and need not be sufficient by itself to establish the defendant's guilt; it is sufficient if the combined weight of the non-accomplice evidence tends to connect the defendant to the offense. *Id.*; *Solomon*, 49 S.W.3d at 361; *Gosch v. State*, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991). When reviewing the corroborating evidence, we view it in the light most favorable to the jury's verdict, and defer to the jury's resolution of any conflicts in the evidence. *Smith*, 332 S.W.3d at 442.

Here, the record shows that Leija was indicted for the same theft offense as Lopez and made an agreement with the State that, if he testified truthfully at trial, the charge against him would be dropped. Therefore, because Leija agreed to testify against Lopez in exchange for

dismissal of his charge, he is considered an accomplice as a matter of law. *Smith*, 332 S.W.3d at 439. Because Leija was an accomplice, his testimony required corroboration pursuant to Code of Criminal Procedure article 38.14 and Penal Code section 31.03(c)(2).

In arguing there is no non-accomplice evidence connecting him to the oil thefts, Lopez relies on the absence of certain evidence, pointing out that: there was no evidence of any suspicious activity in his bank accounts or any financial gain to Lopez; Angel Rodriguez, the owner of the mechanic's garage south of Donna, was not called to testify; Taylor's Qualcomm system never showed his truck located at Angel Rodriguez's garage on a day when Lopez was the driver; and the Hebbronville tanks were never isolated on a day when Lopez drove the truck.[1] Lopez overlooks the existence of several inculpatory documents in the record, the related testimony from Hoffa and Oscar Lopez linking him to the oil thefts, and his own concession that he was the owner operator of the truck (# 84741) used to commit the thefts. Most compelling are: (1) the calendar (State Exhibit No. 183), and related testimony by Hoffa and Oscar Lopez about the underlying reports, showing the daily shortages at the Hebbronville facility for January 2, 2008 through February 2, 2008, including nine days of "significant" shortages on which Lopez himself was the driver; and (2) a summary of Taylor's Qualcomm reports (State Exhibit No. 184) which shows the GPS location of Lopez's truck at Angel Rodriguez's garage near Donna either late at night or early in the morning on three days in January 2008 when Lopez was the driver.

We conclude the combined weight of this non-accomplice evidence, viewed in the light most favorable to the jury's verdict, sufficiently tends to connect Lopez to the commission of the oil thefts. *See id.* at 442. The evidence that Lopez was the driver on nine days during January 2008 when Hebbronville had significant shortages, and that Lopez drove the truck to

---

[1] Oscar Lopez testified that, while he did isolate the tanks on several days when Leija was driving the truck, he planned to, but was unable to, isolate the tanks on the days that Lopez drove because the tanks were either too low or there were other drivers loading at the same time and he did not want to reveal what he was doing.

Rodriguez's garage south of Donna on three of those days at suspicious times outside the normal workday, connects him to the commission of the oil thefts independently of Leija's testimony. We therefore hold that Leija's testimony was sufficiently corroborated by this independent evidence linking Lopez to commission of the oil thefts.

### *Jury Instruction on Accomplice Witness Testimony*

Lopez also asserts the trial court was required to give the jury an accomplice witness instruction under article 38.14, and that he was harmed by the absence of the instruction. *See id.* at 439–40; *see also Druery*, 225 S.W.3d at 498–99; *Paredes*, 129 S.W.3d at 536. When the evidence shows there is no doubt that a witness is an accomplice as a matter of law, the trial court has a duty to instruct the jury that the witness is an accomplice and his testimony must be corroborated to support a conviction. *Druery*, 225 S.W.3d at 498–99 (there must be some evidence of an affirmative act on the part of the witness to assist in the commission of the charged offense before the jury instruction is required); *Paredes*, 129 S.W.3d at 536. A defendant has the right to an accomplice witness instruction if the issue is raised by the evidence, regardless of the trial court's view of the credibility of the evidence. *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006).

Because Leija was an accomplice witness as a matter of law, and there is some evidence of an affirmative act on his part to assist in the commission of the oil thefts, the accomplice instruction was required. *Druery*, 225 S.W.3d at 498–99. However, Lopez did not object to the omission of the accomplice witness instruction and, thus, failed to preserve the error; therefore, he must show egregious harm. *See Casanova v. State*, 383 S.W.3d 530, 533 (Tex. Crim. App. 2012). In assessing the harm of an error based on failure to give an accomplice witness instruction, we consider the effect the instruction has on a trial. As noted by the Court of Criminal Appeals, the purpose of the accomplice witness instruction is

> merely [to] inform[] the jury that it cannot use the accomplice witness testimony unless there is also some non-accomplice evidence connecting the defendant to the offense. Once it is determined that such non-accomplice evidence exists, the purpose of the instruction is fulfilled, and the instruction plays no further role in the factfinder's decision-making.

*Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002). The existence of sufficient non-accomplice evidence can therefore render harmless the court's failure to give an accomplice witness instruction by fulfilling the purpose the instruction is designed to serve. *Id.*; *see also Cocke*, 201 S.W.3d at 747. Whether error in failing to submit an accomplice witness instruction is harmful is a function of the strength of the corroborating evidence, which is assessed based on its reliability or believability, and how compellingly it tends to connect the defendant to the charged offense. *Casanova*, 383 S.W.3d at 539. Egregious harm may result when the corroborating evidence is "exceedingly weak," in that it is inherently unreliable, unbelievable, or dependent upon inferences that a jury might readily reject. *Id.* As discussed above, here the record contains non-accomplice evidence of sufficient strength which connects Lopez to the oil thefts and independently corroborates Leija's testimony. Any error in failing to submit an accomplice witness instruction to the jury is harmless because the purpose of the instruction was fulfilled. *Herron*, 86 S.W.3d at 632 (noting the same analysis applies to both preserved and unpreserved error).

### Sufficiency of the Evidence

Making an argument similar to his argument under the accomplice witness issue, Lopez contends the evidence is legally insufficient to support his conviction because there is no direct evidence implicating him in the oil thefts beyond Leija's accomplice testimony. Having concluded there is sufficient independent evidence corroborating Leija's testimony, we will consider Leija's testimony in our evaluation of the legal sufficiency of all the evidence to support Lopez's conviction for theft under section 31.03.

In reviewing legal sufficiency, we consider all the evidence, both direct and circumstantial, in the light most favorable to the verdict to determine whether any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). It is the jury's role to resolve conflicts in the testimony, assess credibility and weigh the evidence, and draw reasonable inferences from the basic facts to the ultimate facts. *Brooks*, 323 S.W.3d at 899. In conducting a legal sufficiency review, we defer to the jury's assessment of the credibility of the witnesses and the weight to be given to their testimony. *Id.* Further, we must resolve any inconsistencies in the evidence in favor of the jury's verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

Section 31.03 of the Penal Code provides that a person commits the offense of theft if he "unlawfully appropriates property with intent to deprive the owner of property." TEX. PENAL CODE ANN. § 31.03(a); *see Ehrhardt v. State*, 334 S.W.3d 849, 852 (Tex. App.—Texarkana 2011, pet. ref'd) (listing elements of theft). To "appropriate" means to acquire or "otherwise exercise control over property." TEX. PENAL CODE ANN. § 31.01(4)(B) (West Supp. 2012); *McClain v. State*, 687 S.W.2d 350, 353 n.7 (Tex. Crim. App. 1985) (to "appropriate" means any exercise of control over the property in question). Appropriation of property is unlawful when it is without the owner's effective consent. TEX. PENAL CODE ANN. § 31.03(b)(1) (West Supp. 2012). "[T]he actor's knowledge or intent may be established by the uncorroborated testimony of [an] accomplice." TEX. PENAL CODE ANN. § 31.03(c)(2).

Lopez asserts there is no evidence that he ever had possession of any stolen oil, or that he was involved in, or had knowledge of, Leija's theft of the oil. Lopez contends Leija blamed him in order to exculpate himself, and he argues Leija was not credible. First, as discussed *supra*, there were records, reports, and summary documents presented at trial through Taylor employees

that show Lopez was the driver of the truck on nine days in January 2008 on which the Hebbronville tanks had a significant shortage, and that on three of those days Lopez drove the truck to the mechanic's garage south of Donna outside normal work hours. In addition, Leija testified that, beginning in December 2007 when he was hired, Lopez instructed him to retain about 55 to 60 barrels of oil in the truck on the last load at Hebbronville about twice a week. Leija testified he turned over the truck with the diverted oil to Lopez or drove it to Angel Rodriguez's mechanic's shop per Lopez's instructions. On at least one occasion when it was left at the garage, the truck was empty of oil the next morning. Another time, Lopez told Leija he was taking the diverted oil to the port at Brownsville. Leija testified he turned in all of the Taylor forms to Lopez, his boss, and just followed his instructions. Leija further testified that, on the day of the arrest, Lopez instructed Leija to lie to the weight officer about where he was taking the oil. Hoffa testified that neither Leija nor Lopez was authorized by Taylor to only partially unload the truck at Hebbronville or to take any of the oil to another location without permission from a Taylor dispatcher.

Leija's testimony alone is sufficient to establish Lopez's knowledge and intent to commit the thefts. *See* TEX. PENAL CODE ANN. § 31.03(c)(2). The testimony from Leija and the Taylor employees, along with the GPS and shortage records, constitute sufficient evidence for a reasonable jury to find Lopez guilty of theft. It was the jury's role to resolve issues of credibility and any conflicts in the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Sanders v. State*, 119 S.W.3d 818, 820 (Tex. Crim. App. 2003). We hold the evidence is legally sufficient to support the jury's verdict.[2]

---

[2] The jury was instructed that it could find Lopez guilty of theft either as a principal or as a party. Because we find the evidence sufficient to support his liability as a principal, we need not address sufficiency under a party liability theory. *See* TEX. PENAL CODE ANN. §§ 7.01, 7.02 (West 2011).

### *Denial of Motion for Directed Verdict*

Lopez also argues the trial court erred in denying his motion for a directed verdict at the conclusion of the State's case-in-chief.  In his brief, Lopez acknowledges the standard of review for denial of a motion for directed verdict is the same *Jackson v. Virginia* standard used in a legal sufficiency review.  *See Canales v. State*, 98 S.W.3d 690, 693 (Tex. Crim. App. 2003).  Having already conducted a legal sufficiency review, we hold the court did not err in denying Lopez's motion for directed verdict.  Lopez's brief includes a discussion of factual sufficiency of the evidence to support his conviction under this issue.  A factual sufficiency standard does not apply in the context of a motion for directed verdict.  *Id.*  Further, factual sufficiency review has been abolished in criminal cases.  *Brooks*, 323 S.W.3d at 895.

### *Entry of Judgment and Amount of Restitution*

Lopez complains that the trial court did not sign a written judgment until several months after his adjudication of guilt.  At the conclusion of the punishment phase held on November 8, 2010, the trial judge imposed a ten-year sentence but suspended it and placed Lopez on ten years of community supervision.  The judge indicated he would insert the amount of restitution when the written judgment was prepared.  A written judgment was not signed, however, and a new trial judge took the bench on January 1, 2011.  The judge held a second sentencing hearing on June 8, 2011, and signed a written judgment imposing $100,000 in restitution.  In arguing it was error to delay entry of a written judgment, Lopez cites to article 37.12 of the Code of Criminal Procedure, which provides that upon a verdict of acquittal or conviction, "the proper judgment shall be entered immediately."  TEX. CODE CRIM. PROC. ANN. art. 37.12 (West 2006).  Lopez, however, fails to show harm from the court's delay in signing a written judgment.

With respect to the imposition of $100,000 in restitution as a condition of his community supervision, Lopez asserts the trial court abused its discretion because the amount is not

supported by the record. Lopez further argues the court failed to consider his financial resources and "the fact that his conviction was based only on the testimony of the alleged accomplice, Agapito Leija, who actually was responsible for the losses incurred by Taylor Propane. . . ." Under article 42.037 of the Code of Criminal Procedure, the trial court has discretion to order a defendant to pay restitution to any victim of the offense. TEX. CODE CRIM. PROC. ANN. art. 42.037(a) (West Supp. 2012); *see Cabla v. State*, 6 S.W.3d 543, 545 (Tex. Crim. App. 1999) (restitution is intended to adequately compensate the victim of the offense in the course of punishing the criminal offender). In determining the amount of restitution, the court is required to consider: (1) the amount of the loss sustained by any victim . . . as a result of the offense; and (2) other factors the court deems appropriate. TEX. CODE CRIM. PROC. ANN. art. 42.037(c) (West Supp. 2012); *see Campbell v. State*, 5 S.W.3d 693, 696 (Tex. Crim. App. 1999) (amount of restitution must be just and must have a factual basis within the loss of the victim). If the offense resulted in a loss of property, the amount of the loss sustained by the victim is calculated based on the greater of the value of the property on the date of the loss, or on the date of sentencing less the value of any part returned. TEX. CODE CRIM. PROC. ANN. art. 42.037(b)(1)(B) (West Supp. 2012). When payment of restitution is made a condition of community supervision, the court is required to consider the defendant's ability to pay. TEX. CODE CRIM. PROC. ANN. art. 42.12 § 11(a), (b) (West Supp. 2012).

Here, State Exhibit No. 181, a document based on Shell's records and admitted into evidence, shows shortages over the loss allowance at the Hebbronville station of 1,597 barrels in December 2007 and 1,764 barrels in January 2008, the period covered by the indictment. The value of these shortages, calculated at the relevant price of $92 per barrel, was approximately $147,000 for December 2007 and $163,000 for January 2008. The evidence showed that Taylor was obligated to reimburse Shell for the amount of such losses in excess of the 0.002 allowance.

Indeed, Krutsinger testified that Taylor paid Shell approximately $430,000 for oil shortages at the Hebbronville facility that occurred from July 2007 through January 2008. The jury convicted Lopez of theft of property valued between $100,000 and $200,000, a lower dollar range than charged in the indictment. Restitution in the amount of $100,000 was thus equal to the minimum value of the property stolen, as found by the jury, which was substantially less than the total value of actual loss during December 2007 and January 2008 shown on State Exhibit No. 181. Further, the record from the second sentencing hearing shows the trial court did consider evidence concerning Lopez's ability to pay the restitution. We hold the amount of restitution is supported by the record and the trial court did not abuse its discretion in imposing $100,000 in restitution as a condition of Lopez's community supervision.

## CONCLUSION

Based on the foregoing reasons, we affirm the trial court's judgment.

Rebeca C. Martinez, Justice

DO NOT PUBLISH